# United States Tax Court

T.C. Memo. 2025-48

JOHN JOSEPH BAUCHE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 12241-20L.                                  Filed May 20, 2025.

————

John Joseph Bauche, pro se.

*Donna L. Crosby* and *Leyla KM Moustapha*, for respondent.

## MEMORANDUM OPINION

MARVEL, *Judge*: Petitioner reported income tax liabilities for his 2014 and 2015 taxable years (years at issue) that he has not paid, and respondent has secured the collection of those liabilities with the filing of a Notice of Federal Tax Lien (NFTL). On August 12, 2024, respondent filed a Motion for Summary Judgment (Motion) asking us to sustain the NFTL filing, which petitioner opposes in his Opposition to Motion for Summary Judgment (Opposition) filed October 1, 2024. Petitioner argues that respondent should be deemed to have accepted his effective tax administration (ETA) offer-in-compromise (OIC) pursuant to section 7122(f).[1] Petitioner alternatively argues that respondent inadequately considered his ETA OIC. We will (1) grant respondent's Motion in part as it relates to section 7122(f), (2) deny respondent's Motion in part as it

———————————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts have been rounded to the nearest dollar.

[*2] relates to the merits consideration of petitioner's ETA OIC, and (3) remand this case to the Internal Revenue Service (IRS) Independent Office of Appeals (Appeals)[2] for a second supplemental hearing.[3]

## Background

### I. *Income Tax Returns*

On March 13, 2017, petitioner untimely filed Form 1040, U.S. Individual Income Tax Return, for his 2014 taxable year.[4] Petitioner reported an income tax liability of $42,317 but tax withholding of only $9,965. In addition to petitioner's reported income tax liability, respondent assessed additions to tax for late filing and late payment. *See* § 6651(a)(1) and (2).

On March 16, 2017, petitioner untimely filed Form 1040 for his 2015 taxable year.[5] Petitioner reported an income tax liability of

---

[2] On July 1, 2019, the IRS Office of Appeals was renamed the IRS Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019). Each name was in effect for part of the time period relevant to this case, and we refer to each as Appeals.

[3] We reach the merits of petitioner's Opposition even though it was untimely filed. *See infra* Background Part V. After extensions, we set a September 30, 2024, deadline for petitioner to file a response to respondent's Motion. In an October 11, 2024, Status Report, respondent called our attention to petitioner's late filing of his Opposition. On November 3, 2024, petitioner filed a Response to that Status Report and attached a pair of emails from this Court concerning petitioner's filing of his Opposition and an attached declaration. The first email is timestamped by petitioner's email service as "Mon, Sep 30, 2024 at 10:56 PM," and the second email is timestamped by petitioner's email service as "Mon, Sep 30, 2024 at 11:59 PM." The body of each email, however, is dated "October 1, 2024." Furthermore, the first email states that petitioner's Opposition was served "10/01/24 1:56 am ET," and the second email states that a declaration in support of petitioner's Opposition was served "10/01/24 2:59 am ET."

Pursuant to Rule 25(a)(3)(A), the cutoff time for timely electronic filing is "at 11:59 p.m. Eastern Time." The emails petitioner provided establish that while his email service appears to use Pacific time to timestamp emails he receives, his Opposition was not timely filed by 11:59 p.m. Eastern time on September 30, 2024. Although we could strike petitioner's Opposition as untimely filed, the circumstances here do not warrant it. In the exercise of our discretion, we will consider the merits of the Opposition. We warn petitioner that we may strike untimely filed documents in the future.

[4] The return was due (after an extension of time to file) on October 15, 2015.

[5] Petitioner did not receive an extension of time to file for his 2015 taxable year. *Cf. supra* note 4. His income tax return was therefore due on April 18, 2016. *See*

[*3] $268,169 but tax withholding of only $9,843. In addition to petitioner's reported income tax liability, respondent assessed additions to tax for late filing, late payment, and failure to pay estimated tax. *See* §§ 6651(a)(1) and (2), 6654.

II. *First Hearing*

On November 9, 2017, respondent mailed Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320, to petitioner notifying him that respondent had filed an NFTL in order to collect the unpaid balance of his assessed income tax liabilities for the years at issue. Respondent filed the NFTL with the Orange County Recorder in Santa Ana, California.

Petitioner's authorized representatives, Mindy Meigs and Joseph P. Wilson, timely submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing, on petitioner's behalf by a letter dated December 15, 2017. The Form 12153 requested collection alternatives of "Installment Agreement," "Offer in Compromise," and "I Cannot Pay Balance," as well as a withdrawal of the NFTL. The Form 12153 also had a checked box labeled "Other" with text beneath it stating that

> [t]he United States government illegally seized all of the taxpayer's funds, more than $600,000, over a year ago but has yet to charge him with a crime. Because the government seized his funds, he is unable to pay his tax liability and is now subject to penalties which should be abated. SEE ATTACHED LETTER.

In the attached letter, Ms. Meigs and Mr. Wilson argued that respondent should "(1) place the tax liabilities in uncollectible status, (2) abate the penalties under IRC § 6651, in full, for both tax years, and (3) withdraw the" NFTL.

Settlement Officer Ryan O'Reilly (SO O'Reilly) of Appeals was assigned to petitioner's section 6320 hearing. On March 28, 2018, SO O'Reilly held a teleconference with Ms. Meigs. Ms. Meigs stated that petitioner had been employed by a company, Masimo, working in social media and while working there had created a company, BoundlessRise,

---

*Zaimes v. Commissioner*, T.C. Memo. 2023-121, at *11 ("The filing due date for calendar-year-2015 returns was April 15, 2016. § 6072(a). Because this day was District of Columbia Emancipation Day, and because the next two days were Saturday and Sunday, a filing made on April 18, 2016, is 'considered timely.' § 7503.").

[*4] LLC (BoundlessRise), that contracted with Masimo to provide search engine optimization services. She explained that Masimo's management was upset when it learned of petitioner's ownership of BoundlessRise and began an investigation; Masimo ultimately terminated petitioner's employment in July 2016. According to Ms. Meigs, the Federal Bureau of Investigation (FBI) picked up the investigation and seized $642,644 from BoundlessRise's bank account in November 2016[6] on the grounds that the subject funds were proceeds of one or more violations of mail or wire fraud or were involved in money laundering. Ms. Meigs argued that petitioner was an employee with no fiduciary responsibility to disclose his ownership of BoundlessRise to Masimo because he did not control contracts or payments. She asserted that after petitioner's funds were seized, he was able to complete his income tax returns but was unable to pay his income tax liabilities because he was living with his mother and his only source of income was from two rental properties. Furthermore, she asserted that the FBI investigation resulted in an indictment in December 2017 and that petitioner was incurring legal fees in addition to his living expenses. She noted that petitioner's parents and sister had secured home equity lines of credit to assist petitioner with his criminal defense fees. SO O'Reilly and Ms. Meigs discussed the possibility of abating the additions to tax, but SO O'Reilly ultimately determined that petitioner was ineligible for abatement.

SO O'Reilly explained to Ms. Meigs that because of the unique circumstances of petitioner's case—namely that petitioner had assets (i.e., rental properties) with enough equity to pay his income tax liabilities in full but his sole source of income was provided by those same assets—SO O'Reilly would recommend closing the case as currently uncollectible with a two-year followup date. On March 29, 2018, SO O'Reilly sent Ms. Meigs and petitioner Form 12257, Summary Notice of Determination, Waiver of Right to Judicial Review of a Collection Due Process Determination, Waiver of Suspension of Levy Action, and Waiver of Periods of Limitation in Section 6330(e)(1), offering petitioner "Currently Not Collectible" status.

On April 4, 2018, SO O'Reilly received a phone call from Ms. Meigs, who stated that she had spoken with petitioner about filing an OIC. Petitioner told her that his brother-in-law had a connection with a lender willing to take a chance on lending against up to 80% of the

---

[6] The Case Activity Record states inaccurately at one point that the FBI's seizure of funds occurred in July 2016. It actually occurred in November 2016.

[*5] equity in one of petitioner's rental properties. She stated that petitioner was willing to submit an OIC in that amount but would need to secure a lien subordination in order to finalize the loan. She asked whether petitioner would be able to use the loan proceeds as the OIC payment, and SO O'Reilly stated that petitioner could but that SO O'Reilly would need to check on how that would work.

On April 12, 2018, SO O'Reilly received a phone call from Ms. Meigs. During the call SO O'Reilly explained that he had researched whether petitioner could use a real property loan to fund an OIC payment: It could be done, but petitioner would need to submit both an OIC package and a lien discharge package at the same time. SO O'Reilly set a May 31, 2018, deadline for Ms. Meigs to provide both.

On May 31, 2018, SO O'Reilly received a faxed letter from petitioner's representatives stating in part that they had sent SO O'Reilly an OIC with relevant forms and enclosures via certified mail. On or about June 7, 2018, SO O'Reilly received Form 656, Offer in Compromise, and Form 433–A (OIC), Collection Information Statement for Wage Earners and Self-Employed Individuals, from petitioner's representatives. Petitioner's signature on the Form 656 was dated May 30, 2018, and the first page of the Form 656 was stamped with an "IRS Received Date" of June 5, 2018, by "PHOENIX APPEALS."[7] The offer amount was $100,000.

A checked box in the "Reason for Offer" section stated "Exceptional Circumstances (Effective Tax Administration)," with text below stating "See Attachment 1 – Explanation of Circumstances." In Attachment 1 petitioner's counsel explained that petitioner had $496,000 of equity in real property that could fully pay his federal income tax liability of $432,000; nonetheless, they also asserted that "sell[ing] both properties . . . [means that] there would be no funds left for [petitioner] and he would no longer have the rental income which makes up 78% of his monthly income." Furthermore, according to them, selling even "one of the properties would reduce [petitioner's] monthly income to less than $1,000[,] which is not enough to cover the cost of his actual and allowable food and transportation expenses." Finally, they stated that petitioner was not able to refinance his properties as originally contemplated.

---

[7] The "IRS CENTER AT BROOKHAVEN" added another stamp indicating receipt on June 11, 2018, and "COIC BROOKHAVEN" added yet another such stamp on June 12, 2018.

**[\*6]**   On June 8, 2018, SO O'Reilly submitted the OIC to respondent's Centralized Offer in Compromise (COIC) unit for processing and investigation.  On or about the same date, SO O'Reilly mailed petitioner and Ms. Meigs Letter 3820, Appeals Received Your Offer in Compromise and We Can Consider It.  On June 29, 2018, the COIC unit mailed petitioner and Mr. Wilson a letter notifying them that petitioner's OIC had been received and would be investigated.  On or about November 13, 2018, Offer Specialist Ron Randall (OS Randall) was assigned to review petitioner's OIC.

On February 8, 2019, after learning that Ms. Meigs was no longer employed at Mr. Wilson's firm, OS Randall left a voicemail with Mr. Wilson requesting a callback to discuss petitioner's case.  Later that day, OS Randall received an updated Form 2848, Power of Attorney and Declaration of Representative, designating Mr. Wilson and Michelle Huh as petitioner's representatives.

On February 28, 2019, OS Randall received a letter dated February 27, 2019, with several exhibits from Ms. Huh.  In the letter petitioner reported that he had obtained employment doing marketing research for a doctor's office beginning July 1, 2018, and provided a Form W–2, Wage and Tax Statement, from that doctor's office indicating that he earned wages of $19,250 for 2018.  OS Randall's plan moving forward was to review petitioner's case history and the newly received information in order to update petitioner's Allowable Expenses Table (ALET), Income/Expense Table (IET), and Asset/Equity Table (AET).

On April 6, 2019, OS Randall reviewed petitioner's case and updated the ALET, IET, and AET.  The ALET showed allowable expenses of $4,281.  Given petitioner's gross monthly income of only $3,474, the IET reflected a negative future income value, which OS Randall also referred to as zero.  *Cf. infra* note 8.  Nonetheless, the AET reflected equity in assets of $324,840.  He then mailed petitioner and Mr. Wilson a letter in which he noted in part that he had completed the OIC review and petitioner would need to increase his offer amount. The letter stated that the circumstances of the ETA OIC had been reviewed: Petitioner was employed, had assets to pay a significantly higher amount than he offered, and had years of employment left to earn income because he was 38 years old.  OS Randall offered to discuss this issue further and set an April 22, 2019, deadline to provide documentation and information.

**[\*7]**    On April 17, 2019, OS Randall and Ms. Huh had a call. Ms. Huh stated that the balances of petitioner's bank accounts were lower than shown on the AET and that some of the accounts had been closed. OS Randall reviewed each account by account number with Ms. Huh and requested the last three months of petitioner's statements. He also informed Ms. Huh that he used an average of the ending balances in the accounts. Ms. Huh had no objections. Ms. Huh and OS Randall agreed that Ms. Huh would provide the requested bank statements by May 1, 2019.

Ms. Huh asked how OS Randall arrived at the valuation of petitioner's real properties. OS Randall informed her that he used the average comparable sales values from Trulia, Zillow, and the local assessor's office. Ms. Huh objected that there was no way the properties were worth that much in the then-existing California market. OS Randall advised her that the only way to resolve that issue was for petitioner to provide a third-party appraisal for each piece of real property. Ms. Huh and OS Randall agreed that if appraisals were to be done, they would be due by May 15, 2019.

Ms. Huh also stated that petitioner was relying on his credit cards to live and that the credit card statements were not reflected on the IET. OS Randall informed her that the IET already reflected zero in future income value, so he would review the statements if petitioner wanted to provide them, but the credit card statements could not change the bottom-line result of zero reflected on the IET.[8]

On May 16, 2019, OS Randall received a letter dated May 15, 2019, with attached exhibits from Mr. Wilson. The exhibits comprised "closing bank statements" for several of petitioner's bank accounts, property appraisal reports for petitioner's real properties, and an updated docket report from petitioner's federal criminal case. On the same day, OS Randall used the newly provided information to update the IET and the AET. These adjustments resulted in a minimum offer amount of $264,395. OS Randall left Ms. Huh a voicemail advising her that the IET still showed zero of future income value; that the AET had been adjusted by removing bank account values and updating the value of petitioner's real estate to reflect the values shown in the property

---

[8] We need not express any view in this Opinion about whether it was correct to use a zero future income value instead of a negative future income value because, as explained *infra* Discussion Part I.C, we review only respondent's determination as supplemented in the supplemental hearing. This issue did not recur in the supplemental hearing.

[*8] appraisal reports; and that the minimum offer amount was now $264,395. OS Randall requested a decision of acceptance or rejection by May 20, 2019.

On May 23, 2019, OS Randall sent Ms. Huh the revised IET and AET tables. In the cover letter OS Randall noted in part that he had requested a response by May 20, 2019, but he had not heard anything from petitioner or his representatives. OS Randall stated that he was referring the case back to Appeals "with the preliminary increase in the offer determination" (i.e., with a $264,395 offer determination as compared to petitioner's $100,000 OIC). On May 28, 2019, respondent sent petitioner and his representatives a letter listing OS Randall as the "[p]erson to [c]ontact" and communicating "a preliminary decision to reject your offer" because "[b]ased upon your current financial information, we have concluded your offer amount must be increased before we can consider acceptance of an OIC at this time to resolve your case. We have considered the special circumstances you raised, but they did not warrant a decision to accept your offer." The letter added that "[d]ue to the fact that you filed a request for a [section 6320] hearing, we are forwarding your case to Appeals. A final determination on the offer will be issued by Appeals in conjunction with your [section 6320] case."

On June 7, 2019, the COIC unit returned petitioner's case to Appeals. On June 12, 2019, Appeals transferred petitioner's case to Settlement Officer JC Sellers (SO Sellers). On August 20, 2019, SO Sellers reviewed the case and confirmed that he had no prior involvement with respect to petitioner. On October 25, 2019, SO Sellers again reviewed petitioner's case. He noted he was in agreement with the preliminary determination that petitioner was able to pay at least $264,395 because the AET showed that the fair market value of petitioner's properties was $1.205 million and the mortgage balances were only $700,977, the difference between which was substantially greater than $264,395. He also stated that the filing of the NFTL was a correct action to protect the Government's interest in petitioner's real property. Finally, he noted that petitioner needed to increase his offer or else the rejection determination and the NFTL would be sustained.

On January 29, 2020, SO Sellers received a call from Mr. Wilson. SO Sellers told Mr. Wilson that petitioner had enough equity in real property to pay his tax liabilities in full. Mr. Wilson stated that petitioner did not have a job, was living with his parents, and had only rental income. Mr. Wilson also stated that he would see whether he could secure additional information to support an ETA OIC. SO Sellers

[*9] agreed to allow Mr. Wilson until February 10, 2020, to provide any such information.

On March 12, 2020, Mr. Wilson mailed SO Sellers a letter with a thumb drive containing several exhibits. According to the Case Activity Record, the

> [f]iles include[d] the grand jury indictment for wire fraud, mail fraud and money laundering, copies of court documents including motions and counter actions, copies of legal service contracts and bills, [a] letter from [an] [i]mmigration attorney advising if [petitioner] is convicted of crimes (felonies) he will be deported back to Canada[,] and [a] Redfin report for property.

On April 9, 2020, SO Sellers reviewed the letter and exhibits and determined to sustain the NFTL and reject the OIC. On April 10, 2020, Appeals mailed petitioner and Mr. Wilson a Letter 5197 stating that the OIC had been rejected and listing SO Sellers as the "[p]erson to contact." The letter stated twice that "the IRS rejection of your offer is sustained." On April 20, 2020, SO Sellers received a call from Mr. Wilson requesting an explanation of the letter rejecting the OIC. SO Sellers explained that "it was issued due to statutes"—presumably, due to section 7122(f)—and that the ETA OIC was not acceptable because petitioner had wages as well as rental income. Mr. Wilson was not aware that petitioner had wages for 2019 and understood SO Sellers's explanation. SO Sellers advised Mr. Wilson that he could not yet close out the section 6320 case and that he was willing to discuss potential collection alternatives "after the COVID[-]19 issues are over and case closure can be completed." Mr. Wilson agreed to call SO Sellers back after August 1, 2020, "when [petitioner] has filed [his] 2019 return" so they could reach a resolution.

On August 31, 2020, SO Sellers reviewed petitioner's case. SO Sellers noted that no contact had been received from Mr. Wilson. SO Sellers also noted that petitioner had requested an extension of time to file his 2019 income tax return on July 1, 2020. SO Sellers determined to close the case as sustained. On September 15, 2020, respondent issued a Notice of Determination Concerning Collection Actions under IRC Sections 6320 or 6330 of the Internal Revenue Code (Notice of Determination) rejecting petitioner's OIC and sustaining the NFTL for the years at issue. The Notice of Determination stated that the "seizure of the funds in the amount of $642,643.00 by the FBI and your ongoing legal expenses do not change the fact that you have income from your

**[*10]** job as well as rental income from your properties which have sufficient equity to full pay the outstanding taxes." The Notice of Determination also rejected petitioner's request for lien withdrawal because of petitioner's "equity interest in two rental properties which would full pay [his] outstanding tax balance."

III. *Tax Court Proceedings*

On October 14, 2020, petitioner filed his Petition in this Court. Petitioner resided in California when he filed his Petition.[9] In paragraph 5 of the Petition, petitioner assigned the following errors to the Notice of Determination:

> THE IRS HAS ABUSED ITS DISCRETION IN REJECTING MY [OIC] BECAUSE I SUFFER AND CONTINUE TO SUFFER FROM ECONOMIC HARDSHIP AND QUALIFY FOR AN OIC BASED ON EFFECTIVE TAX ADMINISTRATION. THE IRS HAS ALSO VIOLATED ITS PROCEDURES IN REJECTING MY OIC. THE IRS WAS REQUIRED TO ACCEPT MY OIC BECAUSE THEY FAILED TO PROPERLY REJECT IT WITHIN 2-YEARS OF IT BEING SUBMITTED.

In paragraph 6 of the Petition, petitioner alleged the following facts in support:

> DUE TO MY HARDSHIP, MY CAREER HAS BEEN DESTROYED, MY REPUTATION HAS BEEN DESTROYED AND MY BUSINESS HAS BEEN DESTROYED. AT THE AGE OF 35, I WAS FORCED OUT OF MY HOME TO LIVE WITH MY PARENTS SO I COULD DECREASE MY LIVING EXPENSES TO MEET BASIC NEEDS AND AFFORD TO LIVE AND PAY MY ATTORNEYS FEES TO DEFEND MYSELF FROM FALSE CRIMINAL CHARGES AND ALLEGATIONS. I HAVE BEEN FORCED TO RENT MY PROPERTIES FOR INCOME THAT I DEPEND UPON TO HELP PAY MY BASIC LIVING AND LEGAL EXPENSES. NOW 39, I HAVE ADDED SIGNIFICANT CREDIT CARD DEBT TO MY ALREADY INCREDULOUS AND MOUNTING LEGAL EXPENSES TO GET THROUGH MY HARDSHIP

---

[9] Unless otherwise agreed by the parties in writing, *see* § 7482(b)(2), venue for an appeal is the U.S. Court of Appeals for the Ninth Circuit, *see* § 7482(b)(1)(G)(i).

**[\*11]** WITH NO WAY TO ACCESS ADDITIONAL FUNDS OR PROPERTY EQUITY TO SURVIVE IN THE MIDST OF A PANDEMIC.

Respondent filed his Answer on January 29, 2021. On July 22, 2021, respondent filed his first Motion for Summary Judgment (not the Motion presently under review). On July 27, 2021, petitioner filed a Motion to Stay Proceedings pending the resolution of petitioner's criminal proceedings. On August 2, 2021, we denied respondent's first Motion for Summary Judgment without prejudice and granted petitioner's Motion to Stay Proceedings.

On November 30, 2021, the indictment in petitioner's criminal case was dismissed. On December 13, 2021, we lifted the stay in this case. On March 11, 2022, respondent filed a second Motion for Summary Judgment (again, not the instant Motion under review). On March 24, 2022, Mr. Wilson and Richard Stack entered appearances as counsel for petitioner. On June 2, 2022, petitioner filed an opposition to respondent's second Motion for Summary Judgment (not the Opposition presently at issue). On July 15, 2022, we denied respondent's second Motion for Summary Judgment without prejudice on account of genuine disputes of material fact concerning whether (1) SO Sellers's declaration, as supplemented, included the complete administrative record and (2) "the settlement officer considered evidence not contained in the administrative record." On September 8, 2022, respondent filed a Motion to Remand this case to Appeals for a further administrative hearing. On September 12, 2022, we granted respondent's Motion to Remand.

IV.    *Supplemental Hearing*

On September 19, 2022, respondent's counsel sent a remand memorandum to Appeals noting that we remanded the case so that a settlement officer could conduct a supplemental hearing that would provide a clean administrative record clearly reflecting all documentation and information reviewed and would allow for a fresh review of petitioner's eligibility for an ETA OIC. On or about October 21, 2022, Appeals assigned Settlement Officer Kathleen Lee (SO Lee) to conduct the supplemental hearing.

On October 26, 2022, SO Lee reviewed the administrative file for this case. On December 30, 2022, SO Lee received from Mr. Stack a letter dated December 29, 2022, "in support of and in renewal of" the

**[*12]** $100,000 ETA OIC along with an updated Form 433–A (OIC) and supporting documentation. In relevant part the letter described the circumstances supporting the ETA OIC as follows:

> [Petitioner] submitted an offer to compromise his tax liabilities on grounds of [ETA] because he has sufficient equity in assets to full pay the liability, but liquidation of those assets would cause an economic hardship. Here, forced liquidation by the IRS would result in a severe economic hardship for [petitioner]. He owns two homes in California with just enough equity to full pay his liabilities. Those homes, however, are both rentals, and he lives off the rental income. The net rents make up about 78% of his monthly income which is less than $2,000. [Petitioner's] actual and allowable expenses per IRS guidelines, are more than $2,000 per month. [Petitioner] tried but was unable to borrow against the properties because of filed IRS and [California Franchise Tax Board] tax liens, which wiped-out all the equity in both homes. Because there is no equity, lien subordination is not a viable option.
>
> [Petitioner] is already struggling to meet basic needs. He does not live a luxurious lifestyle. As a result of his criminal case, which lasted from December of 2017, to November of 2021, [petitioner] was required to move back home with his parents due to his crippling legal bills for criminal defense and civil lawsuits related to the criminal case, which made it impossible to support himself. He has been required to borrow large sums of money from both his parents (about $160,000) and his sister (about $100,000) to finance his legal bills. To make matters worse, on November 28, 2016, the government seized [about] $642,000 of bank account funds belonging to his single-member [limited liability company], which has made it impossible for him to use those funds to pay his tax liabilities. [Petitioner's] expenses are basic and reasonable. Forced liquidation of one or both of the properties will reduce [petitioner's] income to a point where he will not be able to meet basic living expenses.
>
> In the Tax Court proceedings, the government misconstrued the nature of [petitioner's] hardship. The hardship that [petitioner] fears is not the loss of his two

[*13] condos but his inability to pay for his basic living expenses if he no longer has rental income with which to pay such expenses given the low wage that he presently earns. . . .

Given the circumstances, [petitioner] qualifies for an [OIC] based on [ETA] because liquidation of his assets will cause an economic hardship. Furthermore, [petitioner's] income will not increase in the near future given the harm to his business and reputation caused by the criminal charges filed against him in late 2017. Consequently, it would be in the best interests of the government and [petitioner] for the IRS to accept an ETA [OIC].

On January 12, 2023, SO Lee and Mr. Stack had a call to discuss a planned Appeals Referral Investigation (ARI) for petitioner's OIC. On January 17, 2023, SO Lee and her Appeals team manager submitted petitioner's OIC to respondent's Collection Division for an ARI. On January 20, 2023, SO Lee mailed petitioner and Messrs. Wilson and Stack a letter notifying them that petitioner's OIC had been submitted to respondent's Collection Division "for its review and comment."

On February 3, 2023, SO Lee received the ARI review from OS Randall, who again reviewed petitioner's OIC. OS Randall found that "[i]n review of the supporting documents the taxpayer has an ability to pay through income and assets." Regarding petitioner's expenses, OS Randall concluded that it was "unclear what the total monthly household expenses are" for various reasons.

On February 17, 2023, SO Lee mailed petitioner and Mr. Stack a letter with the ARI review from OS Randall attached and requesting a response by March 20, 2023. On March 20, 2023, SO Lee received a letter signed by Mr. Stack expressing disagreement with OS Randall's determination. The letter argued that OS Randall has "reviewed the new information that we submitted to Appeals based on doubt as to collectability [(DATC)] rather than through the lens of ETA/financial hardship, which is the offer that [petitioner] has submitted. [OS] Randall's analysis improperly focuses only on [petitioner's] alleged 'ability [to] pay' rather than on ETA considerations." (Emphasis omitted.) The letter included a description of petitioner's circumstances that was very similar to the one in Mr. Stack's December 30, 2022, letter in support of the renewed OIC. The letter did not specifically take issue with the asset equity or income values determined by OS Randall. It did, however, object that OS Randall's "analysis fails to separately list

**[\*14]** or analyze the specific economic hardship factors that [petitioner] allegedly fails to satisfy."

On April 7, 2023, Mr. Stack sent a letter to SO Lee requesting additional time and stating in part:

> [T]he purpose of this request is to enable us to submit a brief supplemental letter which provides more detailed information about [petitioner's] economic hardship and the conspiracy between his former employer Masimo and their corrupt government connections which resulted in the improper forfeiture of over $642,00[0] of bank account funds belonging to the single-member [limited liability company] of [petitioner], BoundlessRise, for which he received no credit toward his income taxes.

On April 26, 2023, SO Lee and Mr. Stack had a telephone call in which Mr. Stack stated that he wanted to put together a bullet point summary regarding the forfeiture of petitioner's money and that he felt it had to do with the fairness of the OIC. SO Lee granted Mr. Stack until May 26, 2023, to provide a bullet point summary regarding the forfeiture of petitioner's money.

On May 26, 2023, Mr. Stack sent SO Lee a supplemental response to OS Randall's analysis of petitioner's OIC. In the letter Mr. Stack began by stating:

> [T]he purpose of this letter is to provide more detailed information about the economic hardship of . . . [petitioner] and the conspiracy between . . . his former employer Masimo . . . and their corrupt government connections which resulted in the improper forfeiture of over $642,000 of bank account funds belonging to BoundlessRise LLC, a single-member [limited liability company] of [petitioner], for which he received no credit toward his income taxes for the years at issue . . . . In our view, this illegal forfeiture of funds which, if made available to [petitioner], would have resulted in the full payment of [petitioner's] income tax liabilities for [the years at issue], is relevant to the question of whether the IRS should accept this offer on [ETA grounds].

The letter alleged that the criminal action against petitioner had been dismissed with prejudice "as a result of the [district court's] detection of

**[\*15]** 'outrageous government conduct' related to the government's collusion with Masimo and former disgraced FBI agents to seize substantial funds from [petitioner] and to convict him of non-existent crimes." The letter further asserted that "numerous emails between . . . private investigators, insurance adjusters, and [a federal prosecutor] . . . show the highly coordinated manner and careless disregard with which those parties jointly investigated and prosecuted [petitioner] so as to steal more than $642,000 from the bank account of BoundlessRise LLC." (Emphasis omitted.) As a result, the letter alleged, although petitioner "had intended to use those funds to satisfy the amounts that he owed to the IRS," "he was precluded from so using those funds by a corrupt asset forfeiture orchestrated by government and private actors." The letter also alleged that the documents purportedly demonstrating such conduct "weren't made available to [petitioner] in the [c]riminal [a]ction until very late or after [the] conclusion of this [section 6320] matter."[10] (Emphasis omitted.)

> Regarding respondent's conduct, the letter alleged that

> the government's bad faith in the [c]riminal [a]ction . . . infected the IRS's hand[l]ing of the OIC in this proceeding. In any case, given the interrelationship of these matters, the bad faith of the federal prosecutor and investigators in the [c]riminal [a]ction can be attributed to the IRS agents assigned to this case under the 'one federal government' principle.

After quoting extensively from documents from the criminal action, the letter concluded in relevant part:

> In the absence [of] any conviction against [petitioner] for a federal crime, it is patently unjust that the government forfeited $642,643.71 of funds belonging to his single-member [limited liability company,] BoundlessRise. . . . The wrongful actions of the United States in seizing those funds, using false information provided by dishonest private parties . . . must be considered in evaluating [petitioner's ETA OIC].

> Given the circumstances, [petitioner] qualifies for an [ETA OIC] because liquidation of his assets will cause an

---

[10] The reference to the conclusion of this matter presumably refers to the conclusion of the first hearing.

**[\*16]** economic hardship.  Furthermore, [petitioner's] income will not increase in the near future given the harm to his business and reputation caused by the criminal charges filed against him in late 2017.  Consequently, it would be in the best interests of the government and [petitioner] for the IRS to accept an ETA [OIC].  . . .

> [The forfeiture] caused [petitioner] to not only lose $642,000 of funds with which he could have paid his tax liabilities . . . but also to incur mind-numbing legal fees of around $500,000.  Those two facts alone should favorably dispose the IRS to consider acceptance of an ETA, if for no other reason than to effect basic justice.

On July 14, 2023, SO Lee reviewed the administrative file and the correspondence and documentation petitioner provided.  In the course of her review SO Lee noted that Mr. Stack

> is trying to connect the criminal case and [petitioner's] tax case, but they have no connection.  It was not a tax issue that gave rise to the criminal case, so it really has no bearing on the tax issues.  We certainly can't give [petitioner] 'credit' for the seized funds, [as] it wasn't the IRS that took the money.

SO Lee also performed computations to determine petitioner's ability to pay his reported tax liabilities.  Regarding petitioner's income, SO Lee observed that although petitioner "claimed $11,544 in [monthly] expenses" on his updated Form 433–A (OIC), "$9,266 of those were for legal fees."  Furthermore, she observed, "[h]e did not claim any housing expense and the others seem reasonable.  If you disallow the legal fees, which are not for representation in front of the IRS, the total [monthly] expenses are $2,278, leaving $7,312 in [monthly] net income."[11]  Because there were 111 months remaining on the collection period expiration dates for both years at issue, SO Lee multiplied $7,312 by 111 to determine a future income value of $811,632.  Regarding petitioner's assets, SO Lee summed $614,165 in real property equity, $37,518 in bank account balances, $11,174 in vehicle equity, and $1,563 of securities to arrive at $664,420 of net realizable equity in assets.  She

---

[11] In other words, $7,312 in monthly net income was left after SO Lee subtracted the $2,278 of nonlegal monthly expenses petitioner reported on his updated Form 433–A (OIC) from the $9,590 of combined monthly wages and business income petitioner reported on the same form.

[*17] then summed the $811,632 of future income value with the $664,420 of net realizable equity in assets to determine that petitioner had a reasonable collection potential of $1,476,052. She noted that because petitioner's "current balance due is $567,201.14[,] unless we consider [petitioner's OIC] under ETA, the offer is not acceptable, as the [reasonable collection potential] is twice the amount owed."

On July 18, 2023, SO Lee reviewed provisions of the Internal Revenue Manual (IRM) concerning ETA OICs and made an initial determination that petitioner's OIC was not acceptable on ETA grounds. SO Lee summarized Mr. Stack's economic hardship argument as "by forcing [petitioner] to sell his rentals, he will lose his major source of income." SO Lee thus sought to calculate the effect of a sale of petitioner's rental properties on petitioner's monthly income to determine whether Mr. Stack was correct. SO Lee observed that "the [monthly] net rental income is $3,644 (per the 2021 return),"[12] so "[i]f the rentals were sold, [petitioner] would still have [monthly] income of $5,946, less [monthly] expenses [of] $2,278, leaving $3,668 in [monthly] net income."[13] SO Lee recalculated petitioner's future income value by multiplying $3,668 by a factor of 12 (not 111[14]) and arrived at a figure

---

[12] The net income from rental activities shown on line 24 of Part I, Income or Loss From Rental Real Estate and Royalties, of Schedule E, Supplemental Income and Loss, of petitioner's 2021 Form 1040 was $27,013 (i.e., about $2,251 monthly). Petitioner had net income from his rental activities of $43,739 (i.e., about $3,645 monthly) only if $16,726 of depreciation reported on line 23d is added back to the $27,013 net income shown on line 24. SO Lee's depreciation addback worked in petitioner's favor because subtracting only $2,251 of net monthly rental income instead of the $3,644 net monthly rental income that SO Lee used would have left petitioner with $5,061 monthly net income (i.e., $9,590 monthly income minus $2,251 net monthly rental income minus $2,278 monthly expenses) and therefore a higher future income value and reasonable collection potential.

[13] SO Lee calculated the $5,946 hypothetical monthly income figure by subtracting $3,644 of net rental income from the $9,590 of monthly income petitioner reported on his updated Form 433–A (OIC).

[14] Although reasonable collection potential is "generally calculated by multiplying a taxpayer's monthly income available to pay taxes by the number of months remaining in the statutory period for collection and adding realizable equity in assets," *Flynn v. Commissioner*, T.C. Memo. 2022-5, at *4 n.4, in the case of lump-sum OICs (i.e., OICs payable in five or fewer payments within five months), IRM 5.8.5.25 (Sept. 24, 2021) permits a period of 12 months to be used in lieu of the remaining statutory period, at least if the taxpayer cannot fully pay the amount owed under installment agreement guidelines. Petitioner's Form 656 shows that he was proposing a lump-sum OIC, and SO Lee determined that petitioner could not fully pay his 2015 tax liability in the remaining statutory period. The 12-month period SO Lee

[*18] of $44,016. She then added this figure to petitioner's $664,420 of net realizable equity in assets to determine that his reasonable collection potential was $708,436, which was still greater than petitioner's then-current balance due of $567,904, as well as his $100,000 OIC. She concluded that "I don't believe an ETA offer is acceptable, as there is no economic hardship; even if the rentals were sold, [petitioner] has the ability to pay his monthly expenses." She added, however, that "I do want to discuss the case with [Appeals Team Manager Gary Chapman (ATM Chapman)], just to get his take on the ETA arguments" and that she "[s]ent him an email to schedule a time."

On July 19, 2023, SO Lee discussed petitioner's case with ATM Chapman. They agreed "that we will not consider the criminal case/issues in deciding if we can agree to the [OIC]. We will not make a determination based on what was seized or the criminal allegations, [but] only on the facts of the case." They concluded that "only considering the current income and expenses, the fact of the case is that [petitioner] has sufficient income, even without the rental income, so the offer is not feasible. The removal [of petitioner's rental income] does not cause an economic hardship."

On July 21, 2023, SO Lee rereviewed the documents received to date. On July 24, 2023, SO Lee adjusted petitioner's allowable expenses according to IRS guidelines and updated information from petitioner's 2021 tax return, with the result that petitioner's total allowable expenses were only $1,588 per month (instead of $2,278). Using a methodology very similar to her prior calculations,[15] she determined a reasonable collection potential of $1,548,192 (with rental income, as compared to $1,476,052 previously) or $712,266 (without rental income, as compared to $708,436 previously). Therefore, she determined that "neither [reasonable collection potential] allows for the acceptance of the offer. The . . . arguments regarding ETA/Economic Hardship are not supported by the facts of the case." SO Lee noted that "[l]egal [f]ees were not allowed" and that although petitioner had "claimed $9,266" of monthly legal fees, Mr. Stack

---

ultimately used was more favorable to petitioner than the 111-month period she initially used.

[15] SO Lee, however, used $659,970 as petitioner's net realizable equity in assets instead of the $664,420 figure she used previously. Although the decrease is not explained in the Case Activity Record, it worked in petitioner's favor.

**[\*19]** said in one of his letters that [petitioner] pays when he can,[16] so there is no set payment. Also, per IRM 5.15.1.11 [(Nov. 22, 2021)], legal fees can be allowed when they are for representation before the IRS. The legal fees in question here are for [petitioner's] criminal case. Also, there was no documentation provided.

SO Lee proposed to ATM Chapman that they present petitioner with the option of an installment agreement of $8,002 per month (without liquidation of assets) or $4,358 per month (with liquidation of assets).[17] ATM Chapman concurred in SO Lee's proposed course of action.

On July 28, 2023, SO Lee sent petitioner and Mr. Stack a letter stating that she could not recommend acceptance of his ETA OIC, presenting petitioner with the installment agreement options, and stating that her "determination was made based on the facts of this [section 6320] case only." The letter also stated that petitioner's "[r]ealizable [c]ollection [p]otential" (i.e., reasonable collection potential) was $712,266.

On August 9, 2023, SO Lee and Mr. Stack discussed SO Lee's preliminary determinations. Mr. Stack stated that petitioner's financial circumstances had changed. Specifically, Mr. Stack asserted that (1) petitioner's "income, other than the rental income, was from a contract that ended in November"; (2) "some of the deposits [in petitioner's bank accounts] were draws from his [line of credit], not income"; and (3) the State of California was trying to increase petitioner's state tax payments. SO Lee agreed to provide Mr. Stack until August 25, 2023, to provide additional documentation supporting the changed circumstances. In response to SO Lee's question about "why [petitioner] did not pursue getting the [seized] funds back," Mr. Stack replied that petitioner ran out of funds to litigate his claim in the civil forfeiture case concerning the seized funds and had to abandon his claim.

---

[16] Mr. Stack made a statement to this effect in note 2 of his March 20, 2023, letter.

[17] Those figures were $690 higher, respectively, than the $7,312 of monthly net income (with rental income) or $3,668 of monthly net income (without rental income) that SO Lee previously determined petitioner had because of the $690 decrease in allowable expenses from $2,278 to $1,588 that SO Lee determined on July 24, 2023.

**[\*20]** On September 1, 2023, SO Lee received a letter dated August 31, 2023, with attachments from Mr. Stack. The documentation included (1) a copy of a contract with a doctor's office effective March 8, 2022; (2) a November 11, 2022, email from petitioner to the same doctor's office indicating that no contract payments had been made since September 8, 2022; (3) monthly bank account and line of credit account statements; (4) canceled checks drawn on petitioner's parents' bank account allegedly representing loans to petitioner to pay his legal expenses; and (5) a Final Notice Before Levy and Lien from the California Franchise Tax Board showing that petitioner's outstanding 2015 state income tax liability was $130,139 as of August 2, 2023. Mr. Stack also asserted in his letter that the California Franchise Tax Board was trying to increase petitioner's monthly payments from $150 to $2,200.

On October 3, 2023, SO Lee reviewed the administrative file and considered the arguments and documentation, as well as IRM provisions concerning ETA OICs. SO Lee accepted the November 11, 2022, email as proof that petitioner's contract with the doctor's office had been terminated or otherwise would not provide a source of income going forward. She also accepted the bank statements as proof that petitioner no longer had any income other than rental income. Regarding petitioner's argument that some of the deposits in his bank accounts were from a line of credit and were not income, SO Lee did not dispute that contention as such. Instead, she noted that petitioner had drawn over $64,000 from the line of credit between February and August 2023 and included that amount in the AET as a dissipated asset because Mr. Stack had stated in his August 31, 2023, letter that the proceeds were used to pay legal fees.

Regarding petitioner's argument that the California Franchise Tax Board was trying to increase his monthly payments, SO Lee noted that the information provided did not establish that and that the bank statements supported $150 monthly payments. With respect to petitioner's arguments about the seizure of his funds, SO Lee wrote that "while I understand the impact of what [petitioner] went through, the seizure of the funds really has no bearing on whether or not the offer can be accepted." Finally, SO Lee stated that she "will reconsider the [ETA] issue, if there is proof that [petitioner's] income has decreased. Based on what I had received at the time, it was not an appropriate resolution."

SO Lee updated petitioner's collection analysis in accordance with the portions of petitioner's arguments that she accepted, as well as her

**[\*21]** determination that petitioner had dissipated over $64,000 of assets from a line of credit. With respect to petitioner's income, she determined that petitioner had monthly gross income of $3,126 (down significantly from the $9,590 petitioner reported on his updated Form 433–A (OIC) less than a year earlier); after subtraction of $1,588 of allowed expenses, this yielded monthly net income of $1,538 and a future income value (using a factor of 12) of $18,456.[18] Regarding petitioner's assets, she determined that petitioner's net realizable equity in assets should be $724,184 (including the dissipated asset) instead of the $659,970 figure she used previously, *see supra* note 15, a difference of $64,214. Petitioner's reasonable collection potential was therefore $742,640, up from $712,266 previously, and he still had positive monthly net income despite the decreases to income that SO Lee allowed.

Nonetheless, SO Lee noted that Mr. Stack "has argued that by forcing [petitioner] to sell his rentals, he will lose his major source of income; at this time, that is correct, as [h]is only source of income is from the rentals." She further noted that "[i]f he were to sell . . . he would net [approximately $614,000]; most likely more as the properties have probably gone up on value. The total liabilities are [$575,000], so there would [be] a small sum left over after the sales." SO Lee concluded that she wanted to discuss the case with ATM Chapman.

Later in the day, SO Lee and ATM Chapman discussed the pros and cons of accepting petitioner's OIC. SO Lee noted that factors weighing in favor of accepting the OIC included that petitioner "cannot full pay without a forced sale" and that "with the prior criminal charges [petitioner] may have problems securing other employment." Nonetheless, she also noted that several considerations weighed against accepting the OIC. First, "[t]here is sufficient equity to full pay." Second, petitioner "is only 42; he was not convicted of the charges, so he should be able to find other employment, which will relieve any hardship considerations." Third, "the liens protect [respondent's] interest in the property, and the [collection statute expiration dates] are good for another five to six years." Finally, she raised the possibility of a partial pay installment agreement (PPIA), stating: "We are not telling [petitioner] he has to sell, but can consider a PPIA for two years, with a [followup] to review the financial[s]. This protects us from [petitioner's]

---

[18] The Case Activity Record incorrectly records this value as $18,459 instead of $18,456, but SO Lee's calculation of petitioner's reasonable collection potential as $742,640 (instead of $742,643) shows that she used the correct future income value ($18,456) in calculating petitioner's reasonable collection potential.

[*22] possibl[y] selling the property in a few years and walking away with [$600,000] because we accepted only [$100,000]."

On October 13, 2023, SO Lee mailed petitioner and Mr. Stack a letter addressing the arguments petitioner raised, stating that petitioner's ETA OIC would not be accepted, and attaching an updated IET and AET. SO Lee also offered petitioner a PPIA and attached a Form 433–D, Installment Agreement, proposing monthly payments of $1,538 beginning on December 15, 2023, subject to review after two years. SO Lee noted that if petitioner did not respond by October 27, 2023, she would issue a supplemental notice of determination.

On October 26, 2023, SO Lee noted that "[d]ue to a change in my office day schedule, [I am] moving [the] closure date to 11-07-23." On November 6, 2023, SO Lee noted that she had received no response from petitioner or his representatives. On November 7, 2023, SO Lee prepared a draft Supplemental Notice of Determination and sent it to respondent's counsel for review. On December 7, 2023, Appeals issued a Supplemental Notice of Determination Concerning IRS Collection Actions under Internal Revenue Code Sections 6320 or 6330 (Supplemental Notice of Determination).

The Supplemental Notice of Determination sustained the filing of the NFTL and the rejection of the ETA OIC. The Supplemental Notice of Determination stated in part that "it has been determined that you have sufficient assets from which to pay all of your liabilities, so an OIC is not acceptable. You were offered a [PPIA] as a collection alternative, but you failed to respond." It also stated in part: "You argued that by forcing you to sell your rentals, you would lose your only source of income. While we acknowledge that you are currently not employed, you are 42 years old and should be able to find other employment, which will supplement your income."

V.  *Further Tax Court Proceedings*

On December 14, 2023, the parties filed a Status Report attaching a copy of the Supplemental Notice of Determination, and we restored the case to the general docket on December 18, 2023. On March 19 and March 26, 2024, we allowed Mr. Stack and Mr. Wilson, respectively, to withdraw as counsel for petitioner. On July 18, 2024, the parties filed the Administrative Record and a Stipulation as to the Administrative Record. On August 12, 2024, as already stated, respondent filed the instant Motion. On October 1, 2024, petitioner untimely filed his

[*23] Opposition.  *Cf. supra* note 3.  On November 4, 2024, we held a hearing on the Motion.

*Discussion*

I.    *General Principles*

A.    *Background*

When the IRS assesses tax and demands payment, section 6321 automatically imposes a tax lien on the taxpayer's property or property rights.  The lien is treated as arising from the time of assessment.  *See* § 6322.  To perfect this lien, the IRS must file an NFTL, generally in the county where the taxpayer's property is situated.  *See* § 6323(a), (f)(1).  Section 6320 requires the IRS to send notice to the taxpayer that it has filed the NFTL.  *See* § 6320(a)(1) and (2).  This notice must also inform the taxpayer of the taxpayer's right to request a hearing.  *See* § 6320(a)(3)(B).  At the hearing, the taxpayer may raise any relevant issue relating to the unpaid tax or the lien, including appropriate spousal defenses; challenges to the appropriateness of collection action; offers of collection alternatives; and challenges to the existence or amount of the underlying tax liability.  *See* §§ 6320(c), 6330(c)(2).  The determination by the Appeals officer must take into consideration the relevant issues raised by the taxpayer, as well as verification that the requirements of any applicable law or administrative procedure have been met and whether any proposed collection action balances the need for the efficient collection of tax with the legitimate concern of the person that any collection action be no more intrusive than necessary.  *See* §§ 6320(c), 6330(c)(3).

B.    *Jurisdiction and Standard of Review*

We have jurisdiction to review Appeals' determination concerning collection actions when the taxpayer petitions for review.  *See* §§ 6320(c), 6330(d)(1).  Where the validity of the taxpayer's underlying liability is properly at issue, *see* § 6330(c)(2)(B), we review the underlying liability de novo, *Sego v. Commissioner*, 114 T.C. 604, 610 (2000).  Underlying liability includes additions to tax.  *See Katz v. Commissioner*, 115 T.C. 329, 339 (2000).  We review the IRS's determinations respecting any nonliability issues for abuse of discretion.  *Goza v. Commissioner*, 114 T.C. 176, 182 (2000).  Abuse of discretion exists when a determination is arbitrary, capricious, or without sound basis in fact or law.  *See Murphy v. Commissioner*, 125 T.C. 301, 320 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006).

[*24] C.    *Supplemental Hearing*

When we remand a case to Appeals and Appeals issues a supplemental notice of determination, we review the decision as supplemented. *See LG Kendrick, LLC v. Commissioner*, 146 T.C. 17, 36 & n.18 (2016), *aff'd*, 684 F. App'x 744 (10th Cir. 2017); *see also Kelby v. Commissioner*, 130 T.C. 79, 86 (2008). Accordingly, we review respondent's determination as supplemented in the Supplemental Notice of Determination.

D.    *Scope of Review and Summary Judgment Standard*

Absent a written agreement to the contrary, venue for an appeal is the Ninth Circuit. *See supra* note 9. "That court has held that, where de novo review is not applicable, the scope of review in . . . cases [brought under sections 6320 and 6330] is confined to the administrative record." *Starcher v. Commissioner*, T.C. Memo. 2021-144, at *7 (citing *Keller v. Commissioner*, 568 F.3d 710, 718 (9th Cir. 2009), *aff'g in part* T.C. Memo. 2006-166, *and aff'g in part, vacating in part* decisions in related cases); *see also Golsen v. Commissioner*, 54 T.C. 742, 757 (1970) ("[B]etter judicial administration[] requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals . . . ." (Footnote omitted.)), *aff'd*, 445 F.2d 985 (10th Cir. 1971). In other words the Ninth Circuit has linked the applicable scope of review with the applicable standard of review. As explained *infra*, we do not reach the merits of petitioner's underlying liabilities, and we therefore have no occasion to apply de novo review in this Opinion.

Although petitioner argues that the administrative record is incomplete, he has conclusively admitted that the administrative record is complete by executing the Stipulation as to the Administrative Record, which states: "It is hereby stipulated, subject to the right of either party to object as to materiality or relevancy either at trial or on brief, that the exhibits attached hereto constitute the entire administrative record in [this] case; that said exhibits are genuine; and are described and marked hereafter." *See* Rule 91(e) ("A stipulation will be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or as agreed by those parties. . . . A stipulation and the admissions therein are binding . . . ."). Accordingly, "summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is not arbitrary,

[*25] capricious, an abuse of discretion, or otherwise not in accordance with law." *Belair v. Commissioner*, 157 T.C. 10, 17 (2021) (quoting *Van Bemmelen v. Commissioner*, 155 T.C. 64, 79 (2020)).

We are not confined to the administrative record when de novo review is applicable, *see Dietz v. Commissioner*, T.C. Memo. 2023-69, at *8, such as when a taxpayer has made a proper challenge to an underlying liability, *see Stevenson v. Commissioner*, T.C. Memo. 2023-115, at *5. Petitioner's representative raised the issue of whether petitioner's additions to tax for the years at issue should be abated at the outset of the first hearing, but petitioner is deemed to have conceded the issue because he did not raise it in his Petition.[19] *See* Rule 331(b)(4). Petitioner raised only two issues in his Petition. One issue concerns whether section 7122(f) deems respondent to have accepted petitioner's OIC, which is a legal issue that does not depend on the standard of review. *See Brown v. Commissioner*, 158 T.C. 187, 192 (2022), *aff'd*, 116 F.4th 861 (9th Cir. 2024); *see also Manko v. Commissioner*, 126 T.C. 195, 199 (2006). The other issue concerns whether respondent properly rejected his OIC, which is a nonliability issue that we review for abuse of discretion. Accordingly, we do not apply de novo review in this Opinion.

II. *Section 7122(f)*

Section 7122(f) provides in relevant part: "Any offer-in-compromise submitted under this section shall be deemed to be accepted by the Secretary if such offer is not rejected by the Secretary before the date which is 24 months after the date of the submission of such offer." The parties' arguments are easy to understand. Petitioner argues that he submitted his OIC on May 30, 2018, and that respondent did not reject it until the issuance of the Notice of Determination on September 15, 2020, which is more than 24 months later. Respondent argues that he received petitioner's OIC on June 5, 2018, and rejected it on April 10, 2020, when Appeals mailed petitioner and Mr. Wilson a Letter 5197 stating that petitioner's OIC had been rejected. This timeframe is less than 24 months.

---

[19] Respondent contends that petitioner also failed to properly raise the issue because he abandoned it as the first hearing progressed and that this alleged abandonment at the administrative level precludes our review. We need not decide whether respondent is correct because petitioner has conceded the issue by not raising it in his Petition.

**[\*26]** We only need to resolve the parties' disagreement about when the offer rejection occurred; we do not need to address their minor differences about when the OIC was submitted except to deem them to have conceded any arguments about this point not made in their motion papers. *See Smith v. Commissioner*, 159 T.C. 33, 73 (2022) (deeming a litigant to have forfeited arguments made in a cursory fashion "by not fully briefing them in [the] motion papers"). The precise question we confront here is whether, when the Commissioner sends a letter rejecting or returning an OIC and later issues a notice of determination, the letter or the notice of determination constitutes the offer rejection for purposes of section 7122(f). Our precedent holds that the letter rejecting or returning the OIC—not the notice of determination— constitutes the offer rejection for purposes of section 7122(f). *See Brown*, 158 T.C. at 190–91, 193–94; *see also id.* at 198–99 ("Acceptance of [the taxpayer's] argument—that Appeals must issue the notice of determination within 24 months after an OIC is submitted—could place the SO in a dilemma. If the SO by that deadline has not resolved every issue raised by the taxpayer, the SO could be motivated to issue a notice of determination prematurely, lest the OIC be 'deemed accepted.'"). We will not upset that apple cart, so to speak.[20] The April 10, 2020, letter clearly communicated that petitioner's OIC was rejected, and SO Sellers and Mr. Wilson discussed that rejection on a call ten days later.[21] Respondent is correct that the offer rejection occurred on April 10, 2020,

[20] Judge Lee cast the deciding vote in the Ninth Circuit's *Brown* decision and concurred in the judgment only. *Brown v. Commissioner*, 116 F.4th at 875–79 (Lee, J., concurring in the judgment). He trod a substantially different analytical path from the one taken by this Court. Nonetheless, his reasoning would counsel in favor of the same result in this case because, in Judge Lee's view, "[section] 7122(f) does not apply to [OICs] submitted during [lien or levy] hearings . . . . [The taxpayer's OIC] could thus have never been deemed accepted through operation of law." *Id.* at 878–79. This Court's binding precedent, coupled with the lack of a binding precedent from the Ninth Circuit, leaves us with no occasion to consider the merits of Judge Lee's view. *Cf. id.* at 888 (Bumatay, J., dissenting) ("Because the panel here has split three ways, none of our pronouncements today carry the weight of precedent."). We simply note that (if adopted) it would also support the result reached in this case, albeit via a line of reasoning that would lead to different results in other cases.

[21] During that call, SO Sellers explained that the rejection letter "was issued due to statutes"—presumably, due to section 7122(f)—and that the ETA OIC was not acceptable because petitioner had wages as well as rental income. Mr. Wilson understood that explanation. *Cf. United States v. Lincir*, No. 21-55722, 2022 WL 17958631, at *2 (9th Cir. Dec. 27, 2022) ("[S]ubsequent communications between [the taxpayer] and the IRS demonstrate that [the taxpayer] understood that his first OIC was returned."). Mr. Wilson therefore understood that the OIC had been rejected before the close of the relevant two-year period.

**[\*27]** at the latest,[22] with the result that respondent was not deemed to have accepted petitioner's OIC by operation of section 7122(f). This is true regardless of exactly when petitioner submitted his OIC within the date range spanning May 30 to June 5, 2018, inclusive.

### III.   *Abuse of Discretion*

We review the administrative record to determine whether Appeals (1) properly verified that the requirements of applicable law or administrative procedure have been met; (2) considered any relevant issues that petitioner raised; and (3) considered whether the NFTL balances the need for the efficient collection of taxes with petitioner's legitimate concern that any collection action be no more intrusive than necessary. *See* §§ 6320(c), 6330(c)(3); *Lunsford v. Commissioner*, 117 T.C. 183, 184 (2001).

### A.   *Verification*

We have authority to review satisfaction of the verification requirement regardless of whether the taxpayer raised the issue at the section 6320 hearing. *See Hoyle v. Commissioner*, 131 T.C. 197, 200–03 (2008), *supplemented by* 136 T.C. 463 (2011). SO Lee confirmed the proper issuance of notice and demand for payment, filing of the NFTL, and issuance of notice of a right to a section 6320 hearing; that assessments were properly made for each year at issue; that balances were due when the NFTL filing was requested; and that she had no prior involvement with respect to the years at issue. Petitioner does not challenge any aspect of SO Lee's verification that all legal and administrative requirements were met. SO Lee properly verified that all of the applicable requirements were met.

---

[22] Under our precedent, the offer rejection possibly occurred even earlier. Respondent's May 28, 2019, letter communicating a preliminary offer rejection from the COIC unit may have been the relevant offer rejection, which would mean that petitioner's OIC was pending for less than a year. *Cf. Brown*, 158 T.C. at 196 (stating that a taxpayer's argument that his OIC, which he made as part of a section 6320 hearing, "requires a final determination by Appeals . . . is meritless because it confuses two kinds of finality: the administrative return of an OIC [by the COIC unit], which terminates the 24-month period under section 7122(f), and the notice of determination, which terminates the [lien or levy] proceeding"). The May 28, 2019, letter at least arguably meets the requirement that "the IRS issue[] a written notice to the taxpayer or his representative, advising of the rejection, the reason(s) for rejection, and the right to an appeal." Treas. Reg. § 301.7122-1(f)(1).

[*28] B.  *Issue Raised*

The sole issue reviewable for abuse of discretion, raised by petitioner at the section 6320 hearing, and preserved in his Petition concerns whether respondent should have accepted petitioner's ETA OIC.  Section 7122(a) authorizes the Secretary to compromise any civil or criminal case arising under the internal revenue laws.  Section 7122(d)(1) provides that the Secretary shall prescribe guidelines for the determination of whether an OIC should be accepted, and thus the decision whether to accept or reject an OIC is left to the Secretary's discretion.[23]  *See* Treas. Reg. § 301.7122-1(c)(1).  Accordingly, we generally uphold the rejection of an OIC when Appeals has followed the IRM.  *See, e.g.*, *Churchill v. Commissioner*, T.C. Memo. 2011-182, 102 T.C.M. (CCH) 116, 117; *Atchison v. Commissioner*, T.C. Memo. 2009-8, 97 T.C.M. (CCH) 1034, 1036.

The regulations under section 7122 set forth three grounds for the compromise of a taxpayer's liability: doubt as to liability, DATC, and the promotion of ETA.  Treas. Reg. § 301.7122-1(b).  Petitioner's OIC sought a compromise based on the promotion of ETA.  The Secretary may compromise a tax liability on ETA grounds if either (1) the Secretary determines that, although collection in full could be achieved, collection of the full liability would cause the taxpayer economic hardship within the meaning of Treasury Regulation § 301.6343-1 or (2) no other grounds for a compromise exist and

> compelling public policy or equity considerations identified by the taxpayer provide a sufficient basis for compromising the liability.  Compromise will be justified only where, due to exceptional circumstances, collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner.  A taxpayer proposing compromise [on this basis] will be expected to demonstrate circumstances that justify compromise even though a similarly situated taxpayer may have paid his liability in full.

Treas. Reg. § 301.7122-1(b)(3)(i) and (ii).  Nonetheless, "[n]o compromise to promote [ETA] may be entered into if compromise of the liability

---

[23] Section 7122(d)(2) further provides that "[i]n prescribing guidelines under paragraph (1), the Secretary shall develop and publish schedules of national and local allowances designed to provide that taxpayers entering into a compromise have an adequate means to provide for basic living expenses."

**[\*29]** would undermine compliance by taxpayers with the tax laws." *Id.* subdiv. (iii). Under an IRM provision in effect at the time the Supplemental Notice of Determination was issued,[24]

> [a] taxpayer who has submitted an offer under [non-economic hardship (NEH)]-ETA [grounds] or has requested consideration of any public policy or equity issues during the offer investigation must have those issues reviewed by [a specialty group established in Austin, Texas (Austin Office),] prior to rejection of the taxpayer's offer or before a rejection is sustained.

IRM 5.8.11.5.1(8) (Oct. 4, 2019); *see Estate of Washington v. Commissioner*, T.C. Memo. 2022-4, at \*17 ("[T]he Austin Office investigates . . . a specific subset of [ETA] offers referred to as [NEH-ETA] offers."); IRM 8.22.7.4.2(2) (Aug. 26, 2020) (stating that an OIC considered on NEH-ETA grounds must "be forwarded to the Compliance ETA team in Austin, Texas, for an initial consideration," including when NEH-ETA "is later raised as a new issue in an existing offer"); *see also Estate of Washington*, T.C. Memo. 2022-4, at \*16 n.10 (stating that the IRS established the Austin Office in 2002 to develop consistency in the interpretation and application of the rules regarding ETA OICs); *cf. Brown v. Commissioner*, T.C. Memo. 2025-17, at \*4–5, \*12–13; IRM 5.8.11.5.1(2) (stating that "a Specialty Group has been established in Austin, [Texas,] to work" OICs submitted under public policy or equity provisions).

In reviewing Appeals' consideration of petitioner's ETA OIC, we proceed in two parts. First, we consider Appeals' rejection of petitioner's ETA OIC on economic hardship grounds. Second, we inquire into Appeals' lack of consideration of petitioner's ETA OIC on NEH (i.e., public policy or equity) grounds. *Cf. Bogart v. Commissioner*, T.C. Memo. 2014-46, at \*8–13. We determine that a remand is necessary in both respects.

### 1. *Economic Hardship*

We have carefully considered SO Lee's economic hardship analysis. We do not reach most of the parties' arguments, however,

---

[24] Unless otherwise stated, this Opinion discusses IRM provisions in effect on December 7, 2023, the date that Appeals issued the Supplemental Notice of Determination.

**[\*30]** because the administrative record is inadequate to permit us to review SO Lee's conclusions.

Economic hardship means the inability to pay reasonable basic living expenses. *See* Treas. Reg. § 301.6343-1(b)(4)(i); *see also* Rev. Proc. 2003-71, § 4.02(3)(a), 2003-2 C.B. 517, 517. "The determination of a reasonable amount for basic living expenses . . . will vary according to the unique circumstances of the individual taxpayer. Unique circumstances, however, do not include the maintenance of an affluent or luxurious standard of living." Treas. Reg. § 301.6343-1(b)(4)(i); *cf. supra* note 23 (discussing basic living expenses). Treasury Regulation § 301.7122-1(c)(3) sets forth the following nonexhaustive list of factors that would support (but are not conclusive of) a finding of economic hardship: (1) a long-term illness, medical condition, or disability which is expected to exhaust the taxpayer's financial resources, (2) the total depletion of a taxpayer's income resulting from the provision of dependent care, and (3) the taxpayer's inability to borrow against the equity in the taxpayer's assets where liquidation of those assets would render the taxpayer unable to meet basic living expenses.

The IRM supplies additional provisions to guide these evaluations. It is helpful to begin by discussing reasonable collection potential and then using that concept to compare an ETA OIC with a DATC OIC. Reasonable collection potential equals net realizable equity in assets (as well as any amounts collectible from third parties and any assets or income that are available to the taxpayer but are beyond the reach of the Government) plus the taxpayer's expected future income (less necessary living expenses) projected over a given period. IRM 5.8.4.3.1 (Apr. 30, 2015). "As a general rule, the taxpayer's current income should be used in the analysis of future ability to pay." IRM 5.8.5.20(2) (Sept. 24, 2021). Nonetheless, if "[a] taxpayer is temporarily or recently unemployed or underemployed," the IRS will "[u]se the level of income expected if the taxpayer were fully employed and if the potential for employment is apparent" and will "[j]udge each case on its own merit, including consideration of special circumstances or ETA issues." *Id.* 5.8.5.20(4).

Whether an ETA OIC or a DATC OIC is appropriate depends on the taxpayer's reasonable collection potential. In a DATC OIC the tax liability equals or exceeds the taxpayer's reasonable collection potential. IRM 5.8.11.3(1) (Oct. 4, 2019). By contrast, in an ETA OIC, the tax liability is less than the taxpayer's reasonable collection potential. *Id.* In other words, in an ETA OIC, the taxpayer's reasonable collection

**[\*31]** potential shows that the tax liability could be collected in full in a lump sum, through an installment agreement, or via a combination of both. *Id.*

When a taxpayer indicates that ETA criteria or other special circumstances apply, an offer investigation may proceed without an initial calculation of whether the taxpayer can full pay via an installment agreement. IRM 5.8.5.2(2) (Sept. 24, 2021). In the case of an ETA OIC based on economic hardship, "[f]inancial analysis includes reviewing basic living expenses as well as other considerations." IRM 5.8.11.3.1(3) (Oct. 4, 2019).

> The taxpayer's income and basic living expenses must be considered to determine if the claim for economic hardship should be accepted. Basic living expenses are those expenses that provide for health, welfare, and production of income of the taxpayer and the taxpayer's family. National and local standard expense amounts are designed to provide accuracy and consistency in determining [the] taxpayer's basic living expenses for domestic taxpayers. These standards are guidelines and if it is determined that a standard amount is inadequate to provide for a specific taxpayer's basic living expenses, allow a deviation. Request the taxpayer provide reasonable substantiation to support the deviation and document the case file.

*Id.* 5.8.11.3.1(4). Absent special circumstances, the determination of a taxpayer's housing and utility expenses "use[s] the amount that is claimed or the standard, whichever is less."[25] IRM 5.8.5.22.2(2) (Mar. 23, 2018). In addition to basic living expenses, "other [nonexclusive] factors to consider that impact upon the taxpayer's financial condition include" the taxpayer's age and employment status; the number, age, and health of the taxpayer's dependents; the cost of living in the area where the taxpayer resides; and any extraordinary circumstances such as special education expenses, a medical catastrophe, or a natural

---

[25] The IRS's local standards "establish standards for two necessary expenses: 1) housing and utilities and 2) transportation. Taxpayers will normally be allowed the local standard or the amount actually paid monthly, whichever is less." IRM 5.15.1.8(5) (July 24, 2019). In contrast the IRS's national standards "establish standards for Food, Clothing and Other Items and Out-of-Pocket Health Care Expenses." *Id.* 5.15.1.8(4). "Taxpayers are allowed the National Standard Expense amount for their family size, without a need to substantiate the amount actually spent." IRM 5.8.5.22.1(2) (Oct. 22, 2010).

[*32] disaster.  IRM 5.8.11.3.1(5).  Accounting and legal fees may be allowable if they "are for representation before the IRS (i.e., to resolve current balances due, delinquent returns, examinations, etc.)" or they "meet the necessary expense test."[26]  IRM 5.15.1.11(3).

"The existence of economic hardship criteria does not dictate that an OIC must be accepted.  An acceptable OIC amount must still be determined based on a full financial analysis and negotiation with the taxpayer.  When hardship criteria are identified but the taxpayer does not offer an acceptable amount, the OIC should not be recommended for acceptance."  IRM 5.8.11.3.1(10).  "In economic hardship cases, an acceptable offer amount is determined by analyzing the financial information, supporting documentation, and the hardship that would be created if certain assets, or a portion of certain assets, were used to pay the liability."  *Id.* 5.8.11.3.1(9).

The administrative record is insufficient to permit us to review Appeals' consideration of petitioner's monthly housing expense, and consequently, its determination that petitioner had positive monthly net income and would not face economic hardship if Appeals rejected his OIC.  As already stated, the rule of IRM 5.8.5.22.2(2) that the lesser of claimed housing expense or the local standard is allowable applies only "[a]bsent special circumstances."  *See supra* note 25 and accompanying text.  Petitioner reported no housing expense on his updated Form 433–A (OIC), with the result that (according to Appeals) his allowable housing expense was zero.  Appeals never documented a conclusion about whether special circumstances existed, however.  The reported housing expense of zero, in combination with the dismissed federal criminal case, legal fees, and allegations of a corrupt asset forfeiture, should have indicated to Appeals that special circumstances might exist.  If that were not enough, Mr. Stack's March 20, 2023, letter mentioned that petitioner "was required to move back home with his parents due to his crippling legal bills for criminal defense and civil lawsuits related to the criminal case, which made it impossible to support himself." (Emphasis omitted.)  We take no position on the merits of petitioner's arguments, but Appeals needed to consider whether special circumstances existed to deviate from the general housing expense rule and to document that conclusion for us.  Appeals was too quick to take advantage of petitioner's zero reported housing expense instead of

---

[26] The necessary expense test is met for "expenses that are necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income." IRM 5.15.1.8(1).

[*33] considering whether, for example, petitioner was unable to afford housing because of (in petitioner's telling) unjust criminal proceedings brought against him that wreaked financial havoc. Appeals was also too quick to take the position that petitioner's criminal case and the asset forfeiture could be disregarded entirely. The rigidity of the financial analysis was thus at odds with the IRM.

Appeals' decision to apply the general housing expense rule was highly material because petitioner's monthly net income was relatively low. Assuming arguendo, as Appeals largely did during the supplemental hearing, that petitioner was unable to borrow against his assets, the only consideration that kept petitioner from being a taxpayer who "is unable to borrow against the equity in those assets and [whose] liquidation of those assets to pay outstanding tax liabilities would render the taxpayer unable to meet basic living expenses," see Treas. Reg. § 301.7122-1(c)(3)(C), for most of the supplemental hearing was Appeals' determination of positive monthly net income. That determination, in turn, depended on Appeals' decision not to allow petitioner the standard local housing expense amount. Toward the end of the supplemental hearing, Appeals eventually accepted petitioner's position that his only source of income was rental income from his properties, which would be lost if the properties were sold. Appeals, however, imputed income to petitioner on the basis of his employability. Although the basis for this imputation is not expressly stated in the administrative record, we are able to discern that Appeals was applying the rule of IRM 5.8.5.20(4) concerning temporary or recent unemployment. There is no guarantee, however, that Appeals would have reached the same conclusion about petitioner's ability to generate enough income to cover his monthly basic living expenses if the properly allowable expense amount was higher (e.g., if the standard local housing expense was allowed). The administrative record lacks clear reasoning from Appeals about whether a housing expense deviation should have been allowed because of special circumstances and, if so, whether petitioner could have made enough income to cover the higher expense amount.

We acknowledge that SO Lee and ATM Chapman discussed petitioner's special circumstances, including the criminal charges, to some extent in their October 3, 2023, conversation about the pros and cons of accepting petitioner's OIC. Nonetheless, this conversation was premised on their prior conclusion that they could wholly disregard petitioner's allegations of a corrupt asset forfeiture. This general conversation also was not a substitute for a specific determination about

**[\*34]** whether special circumstances existed to allow a housing expense deviation, which might have also appropriately encompassed other topics, such as petitioner's living situation.

Separately but similarly, Appeals' decision to count the line of credit proceeds as a dissipated asset because they were used for legal fees could only be sustained by guesswork on the administrative record before us. Appeals counted the line of credit proceeds as a dissipated asset solely because they were not used to fund representation before the IRS, but the applicable test is a two-part one: Appeals must consider not only whether the legal fees "are for representation before the IRS (i.e., to resolve current balances due, delinquent returns, examinations, etc.)" but also, alternatively, whether they "meet the necessary expense test." IRM 5.15.1.11(3); *see supra* note 26 and accompanying text. There is no clear conclusion in the administrative record about whether the expense was necessary. *Cf. Commissioner v. Tellier*, 383 U.S. 687 (1966).

We cannot "uphold a notice of determination on grounds other than those actually relied upon by the Appeals officer." *Antioco v. Commissioner*, T.C. Memo. 2013-35, at \*25. "Those grounds must be clearly set forth so that we do not have to guess about why an Appeals officer decided what [she] did." *Id.* Accordingly, we cannot sustain the Supplemental Notice of Determination without clarification and supplementation of the administrative record.

We may remand a case to Appeals for further development when the administrative record does not contain sufficient information to permit us to review Appeals' determination. *See Lunsford*, 117 T.C. at 189; *Antioco*, T.C. Memo. 2013-35, at \*31–32. We will issue an order remanding this case to Appeals for further consideration of petitioner's claim of economic hardship. We will specifically direct Appeals to consider (1) whether petitioner should be allowed the standard local housing expense because of special circumstances, (2) whether petitioner's use of line of credit proceeds for legal fees meets the necessary expense test, (3) petitioner's recent claim at the November 4, 2024, hearing that part of his time is now occupied assisting with caregiving for his elderly father, who has significant health problems, and (4) how to classify petitioner's current employment or unemployment status for purposes of calculating his future income value (e.g., whether petitioner is still properly classified as temporarily or recently unemployed). *Cf.* IRM 5.8.5.20(4) (providing different rules

[*35] for calculating future income depending on the type of unemployment a taxpayer is experiencing).

Finally, even though petitioner has succeeded in obtaining a remand, we must address the fact that petitioner's Opposition inappropriately purports to cite the nonexistent cases "Chesney v. Commissioner, T.C. Memo. 2008-266" and "Adolphson v. Commissioner, T.C. Memo. 2011-201" for support.[27] (Emphasis omitted.) While in our discretion we will not impose sanctions on petitioner, who is proceeding pro se, we warn petitioner that continuing to cite nonexistent caselaw could result in the imposition of sanctions in the future.

## 2. *Public Policy or Equity*

We also identify an alternative ground supporting our decision to remand this case to Appeals. As already stated, IRM 5.8.11.5.1(8) required the Austin Office to review an ETA OIC before rejection (or before a rejection was sustained) if the taxpayer "has submitted an offer under NEH-ETA [grounds] or has requested consideration of any public policy or equity issues during the offer investigation." IRM 8.22.7.4.2(2) states that an OIC considered on NEH-ETA grounds must "be forwarded to the Compliance ETA team in Austin, Texas, for an initial consideration," including when NEH-ETA "is later raised as a new issue in an existing offer."

First, although not dispositive, the administrative record is clear that petitioner submitted his ETA OIC on economic hardship grounds, not public policy or equity grounds. For example, Mr. Stack's December 29, 2022, letter at the outset of the supplemental hearing stated that petitioner "submitted an offer to compromise his tax liabilities on grounds of [ETA] because he has sufficient equity in assets to full pay the liability, but liquidation of those assets would cause an economic hardship." In addition Mr. Stack's March 20, 2023, letter stated that "the offer that [petitioner] has submitted" was "ETA/financial hardship." Although the version of Form 656 in effect when petitioner submitted his Form 656 did not clearly distinguish between economic hardship and public policy or equity grounds for ETA—unlike the current version— the administrative record sufficiently reflects that petitioner and his representatives submitted an ETA OIC on economic hardship grounds,

---

[27] We found the case *Adolphson v. Commissioner*, 842 F.3d 478 (7th Cir. 2016), but it is an appellate opinion affirming on different grounds an unpublished order of this Court dismissing a section 6330 case for lack of subject matter jurisdiction. It has no bearing on the issues here.

**[\*36]** not public policy or equity grounds. *Cf.* IRM 5.8.11.4(2) (Apr. 11, 2024) (providing, in guidance promulgated after the Supplemental Notice of Determination was issued, that "Form 656 instructs taxpayers to select one reason" for compromise, that "[i]f more than one box is checked, . . . an amended Form 656 [should be secured] to reflect the reason the offer is requested," and that "Forms 656 . . . that erroneously request more than one reason for compromise" should not be referred "to the NEH-ETA group").

Nonetheless, and more importantly, it is also clear that petitioner's representatives repeatedly requested consideration of public policy or equity issues throughout the course of the supplemental hearing.[28] The following events—at least in combination, if not standing alone—should have led Appeals to consider obtaining the Austin Office's input (or otherwise to consider whether petitioner's ETA OIC might be reviewable on NEH grounds in accordance with the IRM, *cf. Bogart*, T.C. Memo. 2014-46, at \*13) before rejecting it:

1. On April 7, 2023, Mr. Stack submitted a letter to Appeals stating that he was making an extension request "to enable us to submit a brief supplemental letter which provides more detailed information about [petitioner's] economic hardship and the conspiracy between his former employer Masimo and their corrupt government connections which resulted in the improper forfeiture of over $642,00[0] of bank account funds" and complaining that petitioner "received no credit toward his income taxes" for the forfeiture.

2. On April 26, 2023, SO Lee and Mr. Stack had a telephone call in which Mr. Stack stated that he wanted to put together a bullet point summary regarding the forfeiture of petitioner's money and that he felt it had to do with the fairness of the OIC.

3. Mr. Stack's May 26, 2023, letter made a statement to much the same effect as the one in his April 7, 2023, letter. It also mentioned the district court's alleged detection of outrageous government conduct, "the highly coordinated manner and careless disregard with which [private investigators, insurance adjusters, and a federal prosecutor allegedly] jointly investigated and prosecuted [petitioner] so as to steal more than $642,000 from

---

[28] The supplemental hearing occurred after the indictment in petitioner's federal criminal case was dismissed on November 30, 2021, whereas the first hearing occurred before the dismissal.

**[\*37]** [a] bank account," and that petitioner "was precluded from [applying] those funds [against his taxes] by a corrupt asset forfeiture orchestrated by government and private actors." Although it did not provide authority for the alleged principle it cited, the letter nonetheless stated that "the bad faith of the federal prosecutor and investigators in the [c]riminal [a]ction can be attributed to the IRS agents assigned to this case under the 'one federal government' principle." The letter concluded by stating that "it is patently unjust that the government forfeited $642,643.71 of funds belonging to" BoundlessRise, that "[t]he wrongful actions of the United States in seizing those funds, using false information provided by dishonest private parties . . . *must be considered* in evaluating [petitioner's ETA OIC]" (emphasis added), and that the alleged facts "should favorably dispose the IRS to consider acceptance of an ETA, if for no other reason than to effect basic justice."

A breakdown occurred at Appeals when, after all of these events transpired, (1) SO Lee decided on July 14, 2023, that "[i]t was not a tax issue that gave rise to the criminal case, so it really has no bearing on the tax issues" and (2) SO Lee and ATM Chapman decided on July 19, 2023, that "we will not consider the criminal case/issues in deciding if we can agree to the [ETA OIC]." We will make our point plainly: An alleged corrupt public-private conspiracy to loot BoundlessRise's bank account, which allegedly resulted in petitioner's inability to pay his tax liabilities, is a public policy or equity issue that needed to receive due consideration. We take no position on the merits of those allegations, but they needed to be appropriately considered in accordance with the IRM. The current administrative record is insufficient to permit us to review this matter adequately, necessitating a remand. *See Hoyle*, 131 T.C. at 204–05. We do not hold that an immediate referral was required but only that a referral (or at least consideration of how petitioner's ETA OIC might receive appropriate review on NEH grounds) should have taken place once Appeals exhausted its consideration of petitioner's ETA OIC on economic hardship grounds. *Cf.* IRM 5.8.11.5.1(3) (providing that generally "all cases must have been completely developed under all other bases before transfer will be accepted by the Austin [Office]"). This case is akin to *Bogart*, T.C. Memo. 2014-46, at \*11, in which we concluded that the Commissioner "did not adequately consider" NEH grounds where the taxpayers "requested relief on public policy and equity grounds" but the Appeals officer "merely concluded that the ETA OIC did not merit consideration under public policy or equity grounds."

[*38] We acknowledge that there is no indication in the administrative record that SO O'Reilly, SO Sellers, SO Lee, or OS Randall ever subjectively understood petitioner or his representatives to have submitted an ETA OIC on public policy or equity grounds. Nonetheless, Mr. Stack requested consideration of public policy or equity issues, which is all he needed to do under a plain reading of the IRM to ensure that Appeals would consider (or obtain consideration of) the ETA OIC on NEH grounds. As a practical matter, it may have facilitated the process for petitioner and his representatives to have expressly explained how "collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner" and whether they had "demonstrate[d] circumstances that justify compromise even though a similarly situated taxpayer may have paid his liability in full." *See* Treas. Reg. § 301.7122-1(b)(3)(ii). Nonetheless, we do not perceive such a heightened requirement in the IRM. We will therefore remand this case to Appeals with a direction to obtain appropriate consideration of petitioner's ETA OIC on NEH grounds, at least to the extent that Appeals' reconsideration of petitioner's OIC on economic hardship grounds does not result in acceptance.

C.    *Balancing*

Section 6330(c)(3)(C) requires Appeals to take into consideration whether a proposed collection action balances the need for efficient tax collection with the taxpayer's legitimate concern that any collection action be no more intrusive than necessary. Given our decision to remand, however, we need not address Appeals' balancing analysis.

IV.    *Conclusion*

Respondent is not deemed to have accepted petitioner's ETA OIC pursuant to section 7122(f). Nonetheless, the administrative record is unclear in more than one important respect with regard to petitioner's claim of economic hardship. Appeals also rejected petitioner's ETA OIC without obtaining consideration of whether it was acceptable on the NEH grounds argued by petitioner's representatives. A remand is necessary to supplement the administrative record and permit appropriate judicial review.

We have considered the parties' other arguments and, to the extent they are not discussed herein, find them to be irrelevant, moot, or without merit.

**[*39]**  To reflect the foregoing,

*An appropriate order will be issued.*